## MECUM v. BECKER et al. (No. 6905.)

(Supreme Court, Appellate Division, First Department. March 19, 1915.)

1. FRAUD ☞11—MISREPRESENTATION—OPINION—VALUE.

Misrepresentations concerning the value of real property sold, being expressions of opinion, cannot serve as basis for recovery in an action of tort, which can be predicated only upon false representations made with respect to existing facts, as distinguished from estimates, expectations, opinions, or conjectures.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 12, 13; Dec. Dig. ☞11.]

2. FRAUD ☞58 — MISREPRESENTATIONS — RELIANCE — SUFFICIENCY OF EVIDENCE.

In an action for fraudulent representations in inducing plaintiff to exchange her house for two owned by defendant, evidence *held* insufficient to justify finding that representations were made, and that plaintiff relied thereon in consummating a contract of exchange previously signed.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55–59; Dec. Dig. ☞58.]

3. BROKERS ☞106—REAL ESTATE AGENT—AUTHORITY—SUFFICIENCY OF EVIDENCE.

In an action for fraudulent representations made in inducing plaintiff to exchange her house for two owned by defendant, evidence of authority of a real estate agent to act for defendant *held* insufficient to warrant finding that defendant was liable for representations made by such agent.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 149–153; Dec Dig. ☞106.]

4. TRIAL ☞335—VERDICT—APPORTIONMENT.

Basis must be laid in evidence, as by showing what proportion of the damage each defendant caused, to justify the apportionment of plaintiff's recovery of damages among several defendants.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 788; Dec. Dig. ☞335.]

Appeal from Trial Term, New York County.

Action by Elizabeth A. C. Mecum against C. Adelbert Becker and others. Judgment for plaintiff, and defendant Becker appeals. Reversed.

See, also, 150 N. Y. Supp. 1096.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

Louis Marshall, of New York City (Charles P. Hallock, of New York City, on the brief), for appellant.

Louis O. Van Doren, of New York City (Herrick McClenthen, of New York City, on the brief), for respondent.

LAUGHLIN, J. This action was brought to recover damages for deceit in inducing the plaintiff to exchange her house, known as No. 48 West Tenth street, in the borough of Manhattan, New York, for two apartment houses known as Nos. 2372–74 Webster avenue, borough of the Bronx, which were owned by the appellant, and a recovery has been had for the difference between the actual value of the Webster avenue

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

apartments and their value as it was claimed they represented it to plaintiff to be.

The defendants Mooyer and Marston constituted a firm of real estate brokers employed by the plaintiff, but alleged by her to have acted, without her knowledge or consent, for, and to have received a commission from, the appellant, and the defendant Collins was in the employ of said firm of brokers, and for it had direct charge of the negotiations resulting in the exchange of the properties. Collins did not appeal from the judgment; but Mooyer and Marston appealed, and pending their appeal they settled with the plaintiff for $2,500, and she released them from liability. That settlement and release were the basis of a motion by appellant to vacate the judgment against him, on the ground that the defendants were all joint tort-feasors and that a release of one released all. The motion was denied, and the order was affirmed by this court (Mecum v. Becker, 164 App. Div. 862, 149 N. Y. Supp. 974); and we are informed that an appeal from our decision is pending in the Court of Appeals.

The plaintiff relied principally upon her own testimony to prove her case. No. 48 West Tenth street had been her family home and she had owned the premises since 1898; but after her marriage she left the city and was absent in Illinois for some 15 years. In the meantime she rented the house. In January, 1910, while on a visit to New York City, she met the defendant Collins, whom she had known since her girlhood, on the street, and was informed by him that he was associated with a reliable real estate firm, composed of the defendants Mooyer and Marston. She testified:

That her house became vacant about the 1st of October, 1910, and she called at the office of Mooyer & Marston, and, Collins being absent, she requested one of their employés to list her house for rent and to draw Collins' attention thereto. That a day or two later, but early in October, Collins called on her, and she informed him that it would be necessary to make certain repairs before the house could be rented, and that she desired them made as soon as possible, and at his suggestion they inspected the house, and he advised her that it would cost $5,000 to repair it properly, and that she would never get the money back, and that it would be better to sell, and she urged him to endeavor to sell it, and he asked who she thought would be interested in purchasing it, and she suggested that he see certain neighboring owners, and gave him their names. That about one week later he informed her that he had interviewed those whose names she had given him, and had made other efforts to sell without success, and said that there was no demand for such property at that time, and again reiterated that it was unwise to expend the amount of money necessary to repair the house, and suggested the possibility of exchanging it to her advantage, and said that he would consult his firm on that point. That three or four days later he called again, and stated that he had a friend, a Dr. Becker, the appellant, up in the Bronx, who was a millionaire and a bank president, and a very fine type of man, and who owned apartment houses there, and that he thought he could make an exchange with him, to which she replied that she knew nothing about running apartment houses and wanted nothing to do with that class of property, whereupon he said

that he would take charge for her of any property he took in exchange for her house, and that if Becker would make an exchange with her it would be advisable. That she had no attorney or agent other than Collins and his firm, and she told him she knew nothing with respect to the value of property in the Bronx, and that she was a widow, her family consisting of herself and her son 10 years of age, and that she was dependent upon the income from her house. That about the 1st or 3d of November Collins asked her to see Becker's apartment houses That he said the apartment houses were new, and that the property on Webster avenue was active, and that an exchange for Becker's property would be enormously beneficial to her, and gave her assurances with respect to the high character and standing of his firm and the character and financial standing of Becker, and that he was her friend and desired to help her, and stated that he had had a vast experience and was quite familiar with the value of property in New York, and that the apartments were constructed of the best material. That on Friday, November 4th, he asked her to accompany him next day to see Becker's property, and she agreed to do so, and met him by appointment at the Third Avenue Elevated station at 129th street and went to the Bronx Borough Bank, of which Becker was president, and on the way Collins repeated what he had said before concerning Becker and his apartment houses, and stated that they would need very little repair and very little attention for a long time to come, and that there was a great opportunity for advancement there. That at the bank Collins introduced her to Becker, Collins stating that she was the party they had been talking about with reference to an exchange of property, and that she desired some detailed information concerning his property. That Becker stated that there was a first mortgage on each of the two houses of $15,000, and a second mortgage of $3,500, which had two years to run. That the houses were—

"first-class in every respect; that they are built of the best materials. They are well rented, and the property is in the best part of the Bronx. It will be the best thing you ever did."

That she stated her financial condition to him, and expressed a sense of hesitancy with respect to making any business venture, and he encouraged her by assurance of fair treatment, spoke highly of Collins' qualifications with respect to real estate, and asked if she wanted to see the buildings, and she replied in the affirmative. That they went there in his automobile, and on the way Becker drew her attention to the location of the Central Railroad and its station at 188th street, and to Webster avenue, saying that it would probably become one of the main arteries of the Bronx, and there would be additional transportation facilities in time, and drew her attention to the schools and churches, and to Bronx Park, and that Collins affirmed what Becker said, and asserted that in 10 years the lots would be worth what was then asked for the houses and lots. That she inspected one apartment in one house and two in the other, and the basements. That the apartments were all occupied, and as they inspected them Becker drew attention to "all the little trimmings, different things about the place, as being first-class, all in good condition, and well rented," and praised the plan of the

apartments, and stated that the plumbing work was of the best, and that Collins affirmed everything by saying, "See for yourself," and that everything was first-class and built of the best material, and said that he had watched the foundations from the beginning and knew the construction. That on the way back to the bank Collins advised her, in substance, that she would derive more income from the apartments than from her house, and that it would be to her interest to make the exchange. That she informed Collins and Becker that her house had been producing $65 a month net income, and Becker reiterated his view with respect to the future of his property. That on arriving at the bank they entered Becker's office, and she asked him: "How about running the houses?" And he said that she would have to pay taxes, water rates, interest on the mortgages, insurance, and for coal, light, and janitor service. That she asked him for the items of these expenses, and he said the taxes were $600, the water rent $114, and the interest on the two mortgages, aggregating $30,000, was $1,500, and gave her other information of which she made a memorandum, and then, testifying from that, she said that he stated that the cost per annum for light was $72, for coal $480, for janitor's service $120, insurance $50, and "he said the rent would be $5,112" per annum, and that the income would be sufficient to give her 10 per cent. on her equity in her house, which she had estimated at $22,500, there being a mortgage for $2,500 on the house, and further said that the houses were so well constructed and of such excellent materials that it would be years before they would require any repairs, and that the demand was so great that there was never any difficulty in keeping the apartments occupied, and that—

"if you want to do business here you will have to make up your mind, because I have sold four of these houses this morning, and the property you are looking at I have an offer on, and it won't be long in the market, it is in too great demand."

That Becker said that he held the houses at $27,000 each, and she said she thought it was a high price.

The memorandum which the plaintiff says she made at the time from information given to her by Becker, and which she also says was stated to be the expenses "for the period of one year," was read over to Becker and Collins, and was stated by them to be correct—all of which they deny—is as follows:

| | | |
|---|---|---|
| Int. | $1,500 | both houses |
| Taxes | 600 | " " |
| Water | 114 | " " |
| Ins. | 50 | " " |
| Light | 72 | " " |
| Coal | 480 | " " |
| Janitor | 120 | " " |
| | $2,936 | |
| Rent | $5,112 | |
| | 2,936 | |
| Income | $2,176 | |

No agreement was made at the interview at the bank on the 5th day of November, and plaintiff says Collins accompanied her to the

Elevated station on her return and congratulated her on the opportunity afforded for exchanging her property, and said he was going back to the bank and desired to see her again about the matter in the afternoon, and she said he could see her at 103 East Tenth street. As the proposition stood when she left Becker's bank that day, she wanted $22,500 for her equity, and Becker asked $24,000 for his equity, and he was to discharge the second mortgages, so that there was a difference in their equities in favor of Becker of $1,500.

The plaintiff further testified: That Collins called on her later that afternoon and stated, in substance, that he had persuaded Becker to reduce his price to $22,500, so that their equities would be equal, and presented a draft of a contract for an exchange on that basis, which he advised her to sign, stating that if she waited until Monday it would be too late, and after considerable hesitation she signed the contract in duplicate. That Collins then said that he was going to the office of his firm, and after he left she changed her mind about making the exchange and went to that office, hoping to find Collins. but only found a young lady in charge, who, at her request, telephoned Becker that she did not deem it wise and could not "go on with it," and was informed that Becker replied, "All right." That Collins called on her later in the evening, and complained of her conduct in thus changing her mind and communicating with Becker, and asked her to reconsider her action, and she finally consented to carry out the contract, and at his dictation wrote and signed a letter to Becker, the body of which is as follows:

"Since telephoning you, I have seen Mr. Collins, and after considering the matter more fully I wish to carry out the contract which I executed this afternoon, and trust Mr. Collins will be able to have you complete the contract."

According to the testimony of plaintiff, Collins asked her to go to the office of an attorney named Arnold, who had been employed by his firm to "take charge of the title," and she called there with Collins, and Arnold gave her a memorandum of certain papers which she was requested to present at the time of the closing of the contract, which was December 1st, at Becker's bank in the Bronx.

Plaintiff on cross-examination testified that Becker evidently gave her from memory, in the main, the figures from which she made the memorandum, as no book was brought into the room, and she was not asked to look at any; that she knew that tenants moved, and that there are vacancies, and that repairs are required, and that everything appeared to her on the inspection of the apartments to be as represented by Becker and Collins. It further appears that after signing the contract she made certain inquiries and investigations with respect to the rental of apartments in the vicinity and the expenses of maintenance; that she called on one Phelps, a real estate broker in the Bronx, who owned similar property in the locality, and inspected certain apartments with him, and inquired and was informed with respect to the expenses of maintenance in detail, including janitor service, coal, water rent, light, repairs, and average vacanies and allowances therefor, and was informed that janitor service would be

about $150 per annum per house, which was sufficient to indicate to her that she must have misunderstood Becker in claiming that he represented that janitor's service for both houses would be only $120 per annum. She also called on one Marling, a real estate agent, evidently for the purpose of obtaining his opinion with respect to the advisability of her consummating the contract, and was advised by him that inasmuch as the contract was signed it was too late; and she also consulted Joseph Delafield, an attorney, and was by him referred to Adrian Kiernan, another attorney, and to a Mr. Wells who was an authority on this question. She called on Wells on the 12th day of November and gave him a memorandum in writing, giving the values of the respective properties on the basis on which the exchange was to be made and the incumbrances, and stating the taxes, water rent, insurance, light, coal, and janitor service, as she claims they were represented to her, and on this memorandum she wrote the word "Repairs," with an interrogation point and a blank space following, and the word "Vacancies" and "Commission" in like manner, showing that she realized that there would likely be vacancies and expenditures for repairs.

The Webster avenue houses were duplicates, and Wells made an appraisal of one of them and of plaintiff's house, and submitted his opinion in writing, estimating the Webster avenue houses to be worth $25,000 each, and her house $24,000. Before submitting this appraisal, he observed in a real estate guide that she had made a contract for the exchange, which he had not apparently understood, and he communicated with her, stating, in view of that fact, that he did not see how he could be of any service to her; but she expressed a desire for the information, and he gave it.

The amount of the verdict is based on the testimony of two experts, who gave their opinions as to the value of the Webster avenue houses as they actually were, and, in answer to hypothetical questions, as it would have been if *all* of the representations claimed by the plaintiff to have been made by Collins and Becker were true. There is no evidence of such difference in value based *separately* on the representations claimed to have been made by Collins and Becker, respectively.

The testimony introduced on the part of the defendants with respect to the alleged fraudulent representations controverts the testimony of the plaintiff, and tends to show that there was no intention on the part of Becker to mislead or deceive the plaintiff, or misrepresent anything to her, and that the information imparted to her with respect to the expenses of maintenance and rentals was, in the main, given from Becker's books by his bookkeeper, and, in so far as it was not taken from the books, constituted mere estimates as to the probable future expenses of maintenance.

[1-3] The learned trial court correctly ruled that there could be no recovery based on any representation, even though fraudulently made by appellant, with respect to the *value* of the property (Van Slochem v. Villard, 207 N. Y. 587, 101 N. E. 467), and that the only theory upon which a recovery could be had was that material false representations were made with respect to *existing facts*, as disinguish-

ed from estimates, expectations, opinions, or conjectures with respect to the future. The court, referring to the inspection made and information obtained by the plaintiff intermediate the signing of the contract and the consummation thereof, charged that the plaintiff could not recover unless there were material false representations made as claimed, which were believed and relied upon in conveying her property and in accepting a conveyance from Becker.

It is unnecessary to consider whether, if there were material false representations made by which the plaintiff was induced to sign the contract, a cause of action for the deception at once arose, and whether she was entitled to the benefit of her contract, and was at liberty to consummate it and hold appellant liable, notwithstanding the fact that she discovered the fraud before conveying her property and before suffering any damages (see Ball v. Gerard, 160 App. Div. 619, 146 N. Y. Supp. 81, and cases cited), and no opinion is expressed on that point, for the charge became the law of the case, and it must be assumed that the verdict was rendered on the theory that, notwithstanding the information subsequently acquired by the plaintiff, she relied, in consummating the contract, on the representations made by appellant before it was signed. The verdict of the jury on that issue is, we think, clearly against the weight of the evidence, and could not be sustained, even on the testimony of the plaintiff.

It is manifest that the representation with respect to interest was true, for it was with respect to the two mortgages, subject to which the plaintiff was to take title only, which drew interest at 5 per cent., and she had no interest in the second mortgage which was to be paid off. It appears that the taxes for that year were $632.84, instead of $600, as she claims was represented. On the part of appellant it was shown that the taxes for that year had been levied on a block of houses owned by him, of which these houses were a part, and had not been apportioned at the time of the interview, and that plaintiff was so informed, and was given an estimate of $300 per house, made by appellant's bookkeeper, as to what the taxes would probably be when apportioned. It was finally admitted that the representation with respect to water rates was correct, and that that with respect to the insurance was more than the cost of the insurance. Another claimed misrepresentation was with respect to light, which according to plaintiff was represented at $72, and was estimated on bills produced to have been $74.04. The representation, therefore, if made, was approximately correct. Becker denies that he made any such representation, and claims that any information plaintiff obtained on this and most subjects was given from his books, and by the bookkeeper, who said he gave it accurately, and there is nothing to indicate a reason for his not so doing. The bookkeeper says he *estimated* the cost of lighting at $72 per annum, and so stated to her. The claimed representation as to coal is that the cost was $480 per annum for both houses. There is no evidence to show that it was not true. It merely appears from the testimony of appellant that he bought coal by the barge load, and figured on from 35 to 40 tons for each house per annum; and it appears by the testimony of his bookkeeper that he gave the plaintiff an approximate estimate of the cost of coal for the year ending November

1, 1910, at $5.75 a ton, estimating 40 tons per house, which is less than plaintiff claims was represented to her. The plaintiff claims that it was represented that the cost of janitor service would be only $120 for *both* houses; but, as has been seen, she was informed by Phelps that such service would cost about $150 per annum per house, and appellant and his bookkeeper testified that they estimated for plaintiff the cost of such service to be $10 per month per house, which was based on the total cost of janitor service of several buildings.

As I view the evidence, there was no intentional false statement with respect to the rent, and the plaintiff was not misled by any representations with respect thereto. It appears that the figures were the aggregate rentals on the assumption that all of the apartments were occupied, as they were at the time of the interview, and the rent paid for the entire year. That would seem to be the effect of her testimony, for she says it was represented, in effect, that there had been no vacancies, and, if so, the figures given would indicate the gross rent when full rental was obtained from all apartments. According to the testimony of the appellant's bookkeeper, this was specifically stated to her, and her attention was drawn to the fact that there had been vacancies, and that some free rent had been given for part of the time. It appears that free rentals had been given for the year ending November 1, 1910, to the extent of $92, and that there had been loss of rentals through vacancies in the amount of $311.50, making a total of $403.50. The plaintiff did not testify that it was represented to her that *the actual rentals* received aggregated $5,112. Her testimony shows that the appellant stated to her that the rents "would be $5,112," and that "the yearly rental was $5,112," and that was the income which would have been derived from the rents if it were possible to keep all the apartments at all times occupied, without allowing any free rent, as has to be done, as is well known, when apartments are first rented in the summer.

With respect to plaintiff's claim that appellant in effect represented that there were no expenses for repairs on the buildings for the year preceding, and would not be any for some time to come, the appellant denies that he made any such representations. It appears that there were actual expenditures for repairs on these buildings for the preceding year of $86.04. The testimony of both Collins and appellant is to the effect that the representation made on that subject was, in substance, that the apartments were in a good state of repair, and that the expenses for repairs in the immediate future would be small; and the appellant further says that he informed plaintiff, in substance, that he acquired the buildings before they were fully completed, and had spent considerable money to "put them in good condition." As already stated, it appears that the plaintiff knew that there would be expenses for repairs, and manifestly the amount of such expenses would depend largely upon the manner in which the buildings were used. The appellant denies that he represented that the apartments were in the best part of the Bronx, and manifestly any statement on that subject would be a matter of opinion; and, moreover, she saw for herself where the buildings were. The appellant concedes that he knew when the mortgages were to fall due, and, while he does

not recollect making any statement, he says that if he made any it was in accordance with the fact. It is not apparent that the discrepancy between the actual period and that as claimed to have been represented would have materially influenced the plaintiff, and it is not probable that appellant would make a false representation on that subject for the purpose of deceiving the plaintiff, for the mortgages were of record and she would soon know the truth.

Appellant had not sold any of these apartments, and he and Collins deny that he made the representations as claimed by plaintiff. Such a representation, if made, would not be very material, for it would not bear on the value of the houses transferred, and plaintiff was not taking the houses to sell. If the appellant and Collins represented that the apartments were built of the best material and that the workmanship was of the best, the evidence tends to show that that was untrue; but they deny that such representations were made, and their testimony tends to show that they called upon her to see for herself, and that she had full opportunity for doing so. There is evidence that the materials were suitable and that the workmanship was good for that class of buildings, and there is other evidence tending to show that neither the material nor the workmanship was first-class or good for that class of houses. The plaintiff, who, while not possessing any special knowledge, owned the house on Tenth street, says that on inspection she considered the buildings as represented. There is no evidence with respect to the difference between the actual value of the buildings as they were and their value if they had been as represented with respect to material and workmanship; and in the circumstances it cannot be said, even though the representations with respect to material and workmanship were made as claimed by plaintiff, that the verdict in the amount rendered can be sustained on the ground of those representations.

There was, doubtless, a question of fact for the consideration of the jury with respect to some of these alleged misrepresentations, but we are of opinion that the verdict is clearly against the weight of the evidence with respect to the representations having been made and with respect to plaintiff having relied thereon in consummating the contract. There was no evidence that would warrant a jury in finding that the appellant was responsible for any representations made by Collins, unless it be for those made in his presence, in which he may be said to have acquiesced. It appears that the brokers received commissions from both parties and that Collins shared therein; but there is no evidence that the appellant employed the brokers or Collins, so that they became his agents in making any representations to the plaintiff. It merely appears that when the exchange was made both parties paid a commission to the brokers, and that it was customary for both parties to pay a commission where properties are exchanged.

[4] The jury, after retiring, made a written inquiry of the court for instructions as to whether they were at liberty to render a single verdict against all of the defendants, or whether they could apportion it, and they were instructed that they could not apportion it, but that they might bring in a verdict against all of the defendants, or against the appellant, or against the other defendants. On the evi-

dence, the learned court was doubtless right in so instructing the jury, for there was no foundation laid for an apportionment, although the evidence afforded a basis for testimony with respect to the damages resulting from the separate representations made by the appellant and by the other defendants.

For the reasons stated, however, the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event. Settle order on notice. All concur.